**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN MINCONE, on behalf of himself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>WESTCHESTER MEDICAL CENTER HEALTH NETWORK,<br><br>*Defendant.* | Case No. ____________________<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, JOHN MINCONE ("Plaintiff" or "Plaintiff Mincone"), brings this class action complaint (the "Action") on behalf of himself and others similarly situated against Defendant, WESTCHESTER MEDICAL CENTER HEALTH NETWORK ("Defendant" or "WMCHealth"), upon personal knowledge as to himself and his own actions, information and belief, and the investigation of counsel, and alleges as follows:

## I. INTRODUCTION

1. Plaintiff and Class members are consumers who have used Defendant's website, wmchealth.org, within the statutory period seeking, among other things, to research medical services provided by Defendant.

2. Defendant's provision of medical services comes with a reasonable expectation of privacy because those services necessarily involve the handling of highly confidential health information. Such information—whether relating to physical or mental health, treatment options, or other personal, medical matters—is among the most sensitive in society, and its improper disclosure can undermine public confidence in the healthcare system and deters individuals from seeking care.

3. Plaintiff and Class members are entitled to a reasonable expectation of privacy when they visit Defendant's website and research medical services just as they would expect to receive as ordinary consumers who walk into physical medical offices and hospitals.

4. This is especially true here, where Plaintiff and Class members did not anticipate, invite, or adequately consent to the presence of other third-party corporations looking over their digital shoulders as they investigated medical conditions, Defendant's medical services, Defendant's locations, Defendant's doctors, and other sensitive medical information treatment options and potentially transacted business with Defendant.

5. The fact that Plaintiff accessed Defendant's website to research and procure medical services is, in and of itself, highly sensitive protected health information, but even more so when viewed in tandem with the other identifying datapoints collected by Defendant, such as device identifiers, internet protocol address(es), usernames and login information, etc.

6. However, rather than protect this information, as well as other potential data collected (e.g., personally identifiable information, protected health information, other personal and confidential information, etc.), Defendant allows it to be collected, retained and used by third parties, including Alphabet, Salesforce.com, Inc., Vimeo, LLC, and Call Tracking Metrics LLC, who lack sufficient consent from Plaintiff and Class members to do so.

7. As such, Defendant has invaded or allowed for the invasion of Plaintiff's and Class members' privacy rights.

8. Against that backdrop, Plaintiff seeks to rectify these harms under state and common law, pursuing actual damages, statutory damages, restitution, disgorgement of profit into a constructive trust, pre- and post-judgment interest, reasonable costs and attorneys' fees, a declaratory judgment, injunctive relief and any other relief this Court deems just and proper.

## II. JURISDICTION, VENUE and INTRADISTRICT ASSIGNMENT

9. *Subject Matter Jurisdiction.* This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law (the Electronic Communications Privacy Act ("ECPA")).

This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). Pursuant to CAFA, the amount in controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are well over 100 putative Class members, and minimal diversity exists because one or more putative Class members are citizens

of a different state than the Defendant. Namely, numerous members of the putative Class are domiciled in states around the country other than New York, and Defendant is headquartered in New York.

10. *Personal Jurisdiction.* This Court has personal jurisdiction over the litigants because Defendant is headquartered here, Defendant's acts or practices were directed toward this State (and, thus, Defendant intentionally availed itself of this jurisdiction by choosing to do business here), and because Defendant knew or should have known that tracking technologies were being used to track and intercept the data of Class members in this State since their website is used throughout the United States, including here.

11. *Supplemental Jurisdiction.* This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because all of the claims arise from derive from a common nucleus of operative fact and form part of the same case or controversy

12. *Venue.* Venue is proper because (1) the Defendant is headquartered and conducts business in this District, (2) Defendant's acts or omissions were directed toward this District, (3) a substantial part of the events, acts and omissions giving rise to Plaintiff's and Class members' claims occurred here, and (4) because Class members were harmed here.

## III. PARTIES

*Plaintiff Mincone*

13. Plaintiff Mincone is a resident of the state of New York.

14. During the relevant period, Plaintiff Mincone visited Defendant's website to investigate medical conditions, Defendant's medical services, Defendant's locations, Defendant's doctors, and other sensitive medical information.

15. While on Defendant's website, Plaintiff Mincone was entirely unaware that he was being surreptitiously tracked, and his data collected for advertising and other resale purposes to third parties.

16. Defendant neither adequately informed Plaintiff about the collection and sale of his data to these third parties, nor did they adequately compensate him for this sensitive and valuable information.

17. Plaintiff has suffered the following injuries, among others, due to Defendant's illicit interception and uncompensated disclosure of his private and valuable data to unauthorized third parties:

a. The loss of value of personally identifiable information and/or protected health information that might be associated with Plaintiff's visits to Defendant's website;
b. Intrusion upon Plaintiff and Class members' privacy on Defendant's website where Plaintiff and Class members had a reasonable expectation of privacy;
c. Lack of compensation for the sale of Plaintiff and Class members' data; and
d. Profiting from the sale of Plaintiff and Class members' data in a way that would be inequitable sans disgorgement of profit.

*Defendant WMCHealth*

18. Defendant WMCHealth, is a New York corporation with its principal place of business located in Valhalla, New York.

19. Defendant is a sophisticated business that provides medical services. Defendant claims to be "one of New York's top healthcare systems."

20. In the course of doing business, Defendant maintains a website at the following URL address: wmchealth.org. This website is used by consumers, like Plaintiff and Class members, to procure products or services from Defendant's business.

## IV. FACTUAL ALLEGATIONS

### *Defendant's Business and Privacy Representations*

21. Defendant proports to be "one of New York's top healthcare systems."

22. By its very nature, Defendant's business—a business which is frequented by Plaintiff and Class members—is the type of business that requires heightened levels of privacy. This is why Defendant promises discretion both in the way it conducts its business and how it collects data through its website (and through other means).

23. Indeed, the knowledge that Plaintiff and Class members visited Defendant's website can negatively impact the lives of Plaintiff and Class members if it fell into the wrong hands.

24. For example, Defendant's industry, the medical services industry, is highly regulated especially concerning the collection and maintenance of personally identifiable information ("PII"), and protected health information ("PHI"). It can be embarrassing and otherwise result in negative impacts for consumers if their PII and PHI is improperly collected, maintained, used, and sold.

25. To reassure consumers that their visits to and data collected by Defendant's website are protected, Defendant makes privacy assurances and representations through its Privacy Policy, which can be found on its website. Representations in the Privacy Policy include[1]:

[1]https://www.westchestermedicalcenter.org/Uploads/Public/Documents/WMC/ForPatients/Patient%20Registration/Notice%20of%20Privacy%20Practice%20-%20English.pdf (last visited on September 25, 2025)

a. "WE ARE COMMITTED TO YOUR PRIVACY Westchester Medical Center Health Network (WMCHealth) is required by law to protect the privacy of health information that may reveal your identity….. We will only use or disclose (share) your health information as described in this Notice.";

b. "We mainly use and share your information for treatment, payment, and health care operation purposes. This means we use and share your health information: • With other health care providers who are treating you or with a Pharmacy that is filling your prescription; • With your insurance plan to collect payment for health care services or to get pre-approval for your Treatment; and • To run our business, improve your care, educate our professionals, and evaluate provider performance. Sometimes we may share your information with our business associates, such as a billing service, who help us with our business operations. All of our business associates must protect the privacy and security of your health information just as we do."

c. "Special protections apply if we use or share sensitive health information. This includes HIV-related information, mental health information, alcohol or drug abuse treatment information, or genetic information. For example, under New York State law, confidential HIV-related information can only be shared with persons allowed to have it by law, or persons you have allowed to have it by signing a specific authorization form.";

d. "….we will only use or share your information [For marketing purposes or for the sale of your information or payments from a third party] if you give us permission."; and

e. "OUR RESPONSIBILITES • We are required by law to maintain the privacy of your protected health information. • We will notify you if a breach occurs that may have compromised the privacy or security of your identifiable information. • We must follow the practices described in this Notice and give you a copy of it."

26. These representations are material components of the goods and/or services that Defendant has to offer through its website.

*Defendant Collects (or Allows for the Collection) and Resale of Private Data*

27. Rather than safeguard Plaintiff's private information, Defendant allowed it to be collected and transmitted to third parties. This included data collected about Plaintiff, Plaintiff's website activity, and the fact that Plaintiff visited Defendant's website at all.

28. When someone uses Defendant's website, Defendant (or its website) reports information from that website back to Google or the other third-parties. Once these third parties acquire Plaintiff's and Class members' data, they can then use it for a variety of purposes, including (unwanted) targeted advertising and solicitations, as well as resale to downstream purchasers who may use the data in ways that are unauthorized, unanticipated, and harmful. Thus, Defendant either directly monetized this data or permitted its monetization.

29. Defendant either knew or should have known that third parties were using its website to collect advertising data and likely benefited financially from such activities. These

third parties deploy pixel trackers[2], ad trackers[3], cookies[4], code[5], and/or other tracking technologies (collectively, "Tracking Technologies") to collect data on Plaintiff and Class members and then used that data to deliver them targeted advertisements across various online and social media platforms.

30. These third parties include (but are not limited to):

a. **Alphabet, Inc. d/b/a Google ("Google")**. Defendant embedded Google Tag Manager ("GTM") and associated gtag.js tracking scripts on its website. GTM functions as a tag management system that deploys tracking scripts, which operate similarly to tracking pixels or web beacons, to collect and transmit user interactions. Through these scripts, Google receives data reflecting activity on Defendant's website, including searches for medical conditions, selections of physicians, views of treatment pages, and registrations for events; and

b. **Vimeo, Inc., CallTrackingMetrics LLC, and Salesforce.com, Inc.** These third on Defendant's website. As described above, cookies track the user's browsing activity, potentially capture sensitive health-related activity occurring on pages containing protected health information, and link the activity to individual users without authorization.

---

[2] A pixel tracker (also referred to as a web beacon is an image embedded in a webpage, used to track user behavior and gather data about how people interact with content online. Pixel trackers are typically used for web analytics, marketing, and to collect behavioral data.
[3] An ad tracker is a technology used to monitor, measure, and analyze the performance of digital advertisements.
[4] Cookies are small blocks of data created by a web server while a user is browsing a website to track the user's browsing activity (including clicking particular buttons, logging in, recording which pages were visited, other user engagement, and device information). These cookies potentially capture sensitive health-related activity occurring on pages containing protected health information and link the activity to individual users without authorization.
[5] Code is programming or scripts that are executed on the web, typically running in a browser or on a web server and can include a variety of technologies used to build websites, web applications, or backend services.

31. The data collected from Plaintiff and Class members is highly valuable because it can be used by a wide variety of end-users and maintains its value as it is collected, sold, and resold.

32. Health-related data in particular commands an even higher value than ordinary data. For example, a data aggregator called Datarade.ai advertises access to vast amounts of data tied to individual U.S. citizens, including name, address, email address and telephone number as well as the information that the specific citizen was shopping for a prescription medication. The starting price for access to this data, upon information and belief, begins at $10,000 per year.[6] Other healthcare companies, like Pfizer, spend $12 million annually to purchase health data.[7]

33. Here, Defendant used the data collected from its website users to deliver targeted advertisements. Many of these advertisers would have no way of identifying Plaintiff and Class members as potential customers absent the data Defendant disclosed. The lifeblood for some of these businesses is their advertising: and the ability afforded to them by Defendant to know who potential consumers are is simply too good to resist – even at the behest of that consumer's privacy.

*The Implications of the Secret Collection and Resale of Health Data*

34. Defendant's conduct violates numerous laws as well as basic notions of consumer privacy (especially in the healthcare context).

35. *Defendant's Conduct Violates HIPAA.* The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which was passed in 1996, sets a floor for the care that healthcare providers in New York and across the country are expected to provide in handling

[6] https://datarade.ai/data-providers/rightsify-group-llc/data-products (last visited on September 25, 2025)
[7] https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records (last visited on September 25, 2025).

patient information. Consumers reasonably expect that healthcare providers will handle their private health information in accordance with HIPAA requirements, including by refraining from sharing that information with ad tech companies. Additionally, by receiving ill-gotten private data, especially valuable PII in combination with PHI, the advertisers each served as a conduit for Defendant to monetize this precious and private information.

36. In fact, in December 2022, the United States Department of Health and Human Services ("HHS") issued a revised bulletin "to highlight the obligations" of healthcare providers under the HIPAA Privacy Rule "when using online tracking technologies" such as those used by Defendant, which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application." The bulletin was updated in 2024.[8]

37. In the bulletin, HHS confirmed that HIPAA applies to healthcare providers' use of tracking technologies like those developed and used by Defendant on its website.[9] Among other things, HHS explained that healthcare providers violate HIPAA when they use tracking technologies that disclose an individual's identifying information, even if no treatment information is included and even if the individual does not have a relationship with the healthcare provider:

[8] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited on September 25, 2025).
[9] *Id.*

> How do the HIPAA Rules apply to regulated entities' use of tracking technologies?
>
> Some regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use the regulated entities' website or mobile apps. The information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code. In some cases, the information disclosed may meet the definition of individually identifiable health information (IIHI), which is a necessary pre-condition for information to meet the definition of PHI when it is transmitted or maintained by a regulated entity.
>
> IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates or types of health care services.[10]

38. Additionally, HHS further clarified that HIPAA applies to healthcare providers with tracking technologies even on webpages and on mobile applications that do not require patients to login.[11] This HHS bulletin did not create any new obligations but instead highlights obligations that have been in place for decades.[12] Reasonable consumers would expect that Defendant would comply with these obligations with regard to information about the purchase made on Defendant's website.[13]

*Defendant's Conduct Offends Basic Privacy Rights*.

39. Defendant's goods or services, providing medical services, comes with a reasonable expectation of privacy that exists because of the sensitive nature of the type of work that Defendant does. The same holds true for consumers who electronically walk into digital

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] The Federal Trade Commission has brought a number of actions in federal court against corporations who secretly collect health-related data in the same manner as collected here as well as against corporations who aggregate data collected from third parties through the advertising exchange process, similar to here.

storefronts. These consumers deserve the same privacy rights afforded to ordinary consumers who walk into physical locations of medical providers. This is especially true here, where Plaintiff and Class members did not anticipate, invite, or adequately consent to the presence of other third-party corporations looking over their digital shoulders as they consider transacting business with Defendant.

40. The identifying datapoints collected by Defendant (including, but not limited to, including first and last name, email address, IP address, Google Account ID, and other health information relevant Plaintiff's and Class members' medical conditions, treatment, and scheduling) in tandem with the information that Plaintiff accessed Defendant's website to procure services, on their own, is highly sensitive information.

41. Rather than protect this information, as well as other potential data collected (*e.g.*, PII, PHI, payment card and banking data, etc.), Defendant allows it to be collected, retained and used by third parties, including Google (Alphabet), Vimeo, LLC, CallTrackingMetrics LLC, and Salesforce.com, Inc., who lack sufficient consent from Plaintiff and Class members to do so.

*The Value of Consumer Health Data*

42. Plaintiff and Class members were harmed when Defendant invaded their privacy rights by making their data available for sale about their consumption of Defendant's products.

43. Reasonable consumers, including Plaintiff, would not have used Defendant's website had they known that their privacy rights would be invaded as a result.

44. PII and PHI are extremely valuable. There is a huge market for the data collected on Defendant's website. Plaintiff and Class members have suffered pecuniary losses when Defendant sold and allowed for the resale of their data to unauthorized third parties because of the value of the data itself.

45. In fact, the data at issue is so valuable, it is important to remember that Defendant is not only a provider of medical services but is also a potential data aggregator. That is, part of Defendant's business model appears to include the collection and sale of the data it collects. Without the freedom to control what becomes of their data, Plaintiff and Class members are unable to maintain the value of this data and use it for whatever purposes they expressly authorize.

46. As stated in "Exploring the Economics of Personal Data," "[f]irms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[14] Consumer personal information is so valuable to identity thieves that once PII and PHI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.[15]

47. As the Defendant's industry continues to grow in the United States, so too are the desires of the advertising industry to profit from the data that accompanies demographic and personal information, as well as consumer interest and consumer purchases.

*Harm to Consumers*

48. Plaintiff and Class members provided their data to Defendant to obtain information regarding the goods and services that Defendant provides—goods and services which happen to be highly personal and very private. This information was disclosed to and intercepted by the third parties (*Infra,* at ¶¶ 30, 41) as listed herein through Tracking Technologies. This information was collected and intercepted for business purposes, including to serve targeted advertising.

49. Plaintiff did not consent to the interception or disclosure of this data to these third parties, or to anyone else. As such, Plaintiff has suffered from the type of privacy-centric harms

[14] https://www.oecd.org/content/dam/oecd/en/publications/reports/2013/04/exploring-the-economics-of-personal-data_g17a228d/5k486qtxldmq-en.pdf, p. 4 (last accessed on September 25, 2025)
[15] *Id.*, pp. 27-29.

that a patchwork of contract-based privacy protections and federal, state, and common law principles were intended to collectively protect against.

## V. CLASS ACTION ALLEGATIONS

50. Plaintiff brings this action individually and, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following Classes (collectively, the "Class"):

> **Nationwide Class:** All natural persons in the United States who used the Defendant's website and/or mobile application and whose communications and/or data was shared with third parties during the applicable statutory period.
>
> **New York Sub-Class:** All natural persons in the state of New York who used the Defendant's website and/or mobile application and whose communications and/or data was shared with third parties during the applicable statutory period.

51. Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendant as well as their subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's and Defendant's counsel.

52. *Numerosity*. The exact number of members of the Class is currently unknown and unavailable to Plaintiff, but individual joinder in this case is impracticable. The Class likely consists of thousands or even millions of individuals, and the members can be identified through Defendant's records.

53. *Predominant Common Questions*. The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

a. Whether Defendant violated Plaintiff's and Class members' privacy rights;

b. Whether Defendant was unjustly enriched;

c. Whether Defendant's acts and practices violated state consumer protection laws;

d. Whether Plaintiff and the Class are entitled to equitable relief, including but not limited to injunctive relief, restitution, and disgorgement; and

e. Whether Plaintiff and the Class are entitled to actual, statutory, punitive and/or other forms of damages, and other monetary relief.

54. *Typicality*. Plaintiff's claims are typical of the claims of the other members of Class, arise from the same conduct by Defendant, and are based on the same legal theories.

55. *Adequate Representation*. Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to any Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of the other members of the Class.

56. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

57. Plaintiff may revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## FIRST CAUSE OF ACTION

**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2510 *et seq.***
**(ON BEHALF OF THE NATIONWIDE CLASS)**

58. Plaintiff re-alleges and incorporates all preceding paragraphs with the same force and effect as if fully restated herein.

59. The Electronic Communications Privacy Act ("ECPA") prohibits any person or corporation from intentionally intercepting, using, or disclosing the contents of any electronic communication—or from endeavoring to do so—through certain unlawful means. 18 U.S.C. § 2511.

60. The ECPA protects both sending and receipt of communications.

61. The ECPA provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA. 18 U.S.C. § 2520(a).

62. Plaintiffs and Class members' interactions with Defendant's website are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce," and thus are "electronic communications" within the meaning of 18 U.S.C. § 2510(12). This is especially true as it pertains to transmission of private information between Plaintiff and Class members and Defendant via its website.

63. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

64. The ECPA defines content, when used with respect to electronic communications,

to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

65. The ECPA defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

66. Plaintiff's and class members' browsers and computing devices, Defendant's Website, and/or the Tracking Technologies that Defendant placed or allowed to be placed on its website are all "devices" within the meaning of 18 U.S.C. § 2510(5).

67. By installing Tracking Technologies on its website and servers, or by precuring others to do so, Defendant intentionally intercepted, used, or disclosed the electronic communications of Plaintiffs and Class members—or endeavored to do so—in violation of 18 U.S.C. § 2511(1).

68. The communications that Defendants intercepted include, but are not limited to, communications to/from Plaintiffs and Class members regarding PII and PHI, including first and last name, email address, IP address, Google Account ID, and other health information relevant to Plaintiff's and Class members' medical conditions, treatment, and scheduling.

69. Defendant transmits the contents of those communications through the surreptitious redirection of the communications from Plaintiff's and Class members' computing devices.

70. Plaintiff and the Class members did not consent to the ad tech companies' acquisition of their communications with Defendant. Nor did the ad tech companies receive legal authorization to receive such communications.

71. By intentionally disclosing and using or endeavoring to disclose and use the electronic communications of Plaintiff and Class members to other third parties, while knowing or

having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c) and 18 U.S.C. § 2511(d).

72. Plaintiff and Class members did not authorize Defendant to intercept, use, and/or disclose the content of their communications for purposes of invading Plaintiffs' privacy via Tracking Technologies, and any purported consent that Defendant received from Plaintiff and Class members was not valid. Nor was Defendant acting under color of law when it intercepted Plaintiffs' and Class members' wire or electronic communication.

73. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

74. Here, Defendant intentionally intercepted the contents of Plaintiffs' and Class members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State, including, but not limited to criminal violation of HIPAA, 42 U.S.C. § 1320d-6.[16]

75. Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient. Notably, the penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

76. Here, Defendant intentionally used the wire or electronic communications to

[16] The federal wire fraud statute, 18 U.S.C. § 1343, could also be a predicate offense.

increase its profit margins. Defendant specifically used Tracking Technologies to track and repurpose Plaintiffs' and Class members' PII and PHI for its own financial benefit.

77. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it (a) used and caused to be used identifiers associated with specific patients without patient authorization; and (b) disclosed individually identifiable health information to Google and other third-parties without authorization.

78. Plaintiff and the Class members have suffered damages because of Defendant's violations of the ECPA, including that (1) Defendant eroded the essential, confidential nature of the relationship between Defendant and its customers; (2) Defendant derived valuable benefits from using and sharing Plaintiff's and the Class members' communications without their knowledge or informed consent and without providing compensation; (3) Defendant's actions deprived Plaintiff and the Class members of the value of their PII and PHI; (4) Defendant's actions diminished the value of Plaintiff's and the Class members' property rights in their PII and PHI; and (5) Defendant violated Plaintiff's and the Class members' privacy rights by sharing their PII and PHI for commercial use.

79. Plaintiff and the Class members seek appropriate declaratory or equitable relief including injunctive relief, actual damages and profits enjoyed by Defendant due to the violations or the appropriate statutory measure of damages, punitive damages, and reasonable attorneys' fees and costs. 18 U.S.C. § 2520.

80. Pursuant to 18 U.S.C. § 2520, Plaintiff and the Class members seek monetary damages for the greater of (i) the sum of the actual damages suffered by the plaintiff and any profits made by Defendant due to the violation; or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

81. Unless enjoined, Defendant will continue to commit the violations of law described herein.

## SECOND CAUSE OF ACTION

### VIOLATIONS OF STATE CONSUMER PROTECTION STATUTES – NEW YORK GENERAL BUSINESS LAW § 349 (ON BEHALF OF BOTH THE NATIONWIDE CLASS AND STATE SUBCLASS)

82. Plaintiff re-alleges and incorporates by reference all preceding paragraphs with the same force and effect as if fully stated herein.

83. New York General Business Law § 349 ("GBL 349") prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

84. Defendant is considered a 'businesses' under GBL 349, the conduct alleged herein is a "business practice" within the meaning of GBL 349, and the alleged deception occurred within New York State.

85. As alleged herein, Defendant engaged in unfair and unlawful practices within the meaning of GBL 349 by making material misrepresentations and omissions concerning the information that it assured users it would not share with third parties, which deceived and misled users of Defendant's platform.

86. New York (as well as other states through their respective unfair and deceptive trade practices statutes) has a strong public policy of protecting consumers' privacy interests, including protecting consumers' personal data.

87. As alleged herein, Defendant violated GBL 349 by disclosing and intercepting Plaintiff's and Class members' sensitive data, including PII and PHI, without consent.

88. Defendant's business acts and practices are also "unfair" in that they are immoral,

unethical, oppressive, unscrupulous, and/or substantially injurious to consumers. The gravity of the harm of Defendant secretly disclosing, intercepting, and misusing Plaintiff's and Class members' sensitive and highly valuable personal data (PII and PHI) is significant, and there is no corresponding benefit resulting from such conduct.

89. Finally, because Plaintiff and Class members were completely unaware of Defendant's conduct, they could not have possibly avoided the harm.

90. By unlawfully disclosing and intercepting this data, Defendant has taken money or property from Plaintiff and Class members.

91. As a result of Defendant's deceptive conduct, Plaintiffs were injured in that they never would have provided their PII and PHI to Defendant, had they known or been told that Defendant shared their confidential and sensitive private information with third parties such as Google.

92. Additionally, Plaintiffs and Class Member have suffered lost control and diminution in value of their PII and PHI as well as other harm resulting from the unauthorized use or threat of unauthorized use of their PII and PHI, including for unwanted solicitations, advertisements, and marketing.

93. Plaintiff and the Class members seek all available damages under applicable state consumer protection laws, including statutory damages under GBL 349.

## THIRD CAUSE OF ACTION

**BAILMENT**
**(ON BEHALF OF BOTH THE NATIONWIDE CLASS AND STATE SUBCLASS)**

94. Plaintiff re-alleges and incorporates by reference all preceding paragraphs with the same force and effect as if fully stated herein.

95. Defendant acquired and was obligated to safeguard the PII and PHI of Plaintiff and the Class members.

96. Defendant accepted possession and took control of Plaintiff's and Class members' PII and PHI under such circumstances that the law imposes an obligation to safeguard the property of another.

97. Specifically, and as is the case here, a constructive bailment arises when a person or entity takes lawful possession of the property of another and has a duty to account for that property, without intending to appropriate it.

98. Importantly, constructive bailments do not require an express assumption of duties and may arise from the bare fact of the thing coming into the actual possession and control of a person or entity fortuitously or by mistake as to the duty or ability of the recipient to affect the purpose contemplated by the absolute owner.

99. During the bailment, Defendant owed a duty to Plaintiff and Class members to exercise reasonable care, diligence, and prudence in protecting their PII and PHI.

100. Defendant breached its duty under the constructive bailment by failing to take appropriate measures to safeguard and protect Plaintiff's and Class members' PII and PHI, resulting in the unlawful and unauthorized access to, disclosure, and misuse of such PII and PHI by third parties, such as Google.

101. Defendant further breached its duty to safeguard Plaintiff's and Class members' PII and PHI by failing to notify them individually in a timely and accurate manner that their PII and PHI had been disclosed to third parties without Plaintiff's and the Class members' knowledge, consent, or explicit authorization.

102. As a direct and proximate result of Defendant's breach of its constructive bailment,

Plaintiffs and Class members have suffered compensable damages that were reasonably foreseeable to Defendant, including but not limited to, the damages set forth herein.

## FOURTH CAUSE OF ACTION

### NEGLIGENCE/NEGLIGENCE *PER SE* (ON BEHALF OF BOTH THE NATIONWIDE CLASS AND STATE SUBCLASS)

103. Plaintiff re-alleges and incorporates all preceding paragraphs with the same force and effect as if fully restated herein, except as it pertains to the intentional conduct of the Defendant.

104. While Defendant's conduct was intentional, it was at a minimum (and in the alternative) negligent.

105. By collecting, storing, using, and profiting from Plaintiff's and Class members' PII and PHI, Defendant owed Plaintiff and Class members a duty to exercise reasonable care to secure, safeguard, and protect their highly sensitive personal and private information.

106. Plaintiff and Class members gave Defendant sensitive, nonpublic PII and PHI and did so with a reasonable expectation of privacy in their communications with Defendant, including communications exchanged on Defendant's website.

107. Defendant has a common law duty to prevent foreseeable harm to Plaintiff and Class members.

108. It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII and PHI through their use of Tracking Technologies would result in unauthorized third parties— such as Google—gaining unlawful access to such PII and PHI.

109. Despite their duties as a medical provider and its express promises of

confidentiality, Defendant installed Tracking Technologies on their website that disclosed and transmitted Plaintiff's and Class members' data and communications with Defendant to third parties without Plaintiff's or Class members' knowledge, consent, or authorization.

110. Defendant knew or should have known that it was systemically disclosing Plaintiff's and Class members' PII and PHI to third parties by integrating the Tracking Technologies on its website, and Defendant alone could have ensured that it did not disclose the nonpublic personal information, including PII and PHI, without consumers' consent.

111. Defendant breached their duty of care by, *inter alia*, failing to (i) secure Plaintiff's and Class members' PII and PHI; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of the Tracking Technologies.

112. As a direct result of Defendant's breach, Plaintiff and the Class members have suffered damages that include, but are not limited to, loss of the benefit of the bargain, increased infiltrations into their privacy through unauthorized spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation, and loss of enjoyment of life, and are entitled to damages in an amount to be proven at trial.

113. Defendant's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class members' PII and PHI constitute negligence at common law.

114. Plaintiff and Class members seek to recover the value of the unauthorized access to their PII and PHI resulting from Defendant's wrongful conduct. Put differently, the value of the data is equivalent to whatever the unauthorized third parties pay for that respective data.

115. Additionally, Plaintiffs and Class members have suffered lost control and

diminution in value of their PII and PHI as well as other harm resulting from the unauthorized use or threat of unauthorized use of their PII and PHI, including for unwanted solicitations or marketing,

116. As such, Plaintiff seeks damages in an amount to be proven at trial and such other relief as the Court may deem just and proper.

117. Where allowable, in addition to or alternatively to this count, Plaintiff pleads a Negligence *Per Se* count because Defendant's conduct violates HIPAA**.**

## FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT
### (ON BEHALF OF BOTH THE NATIONWIDE CLASS AND STATE SUBCLASS)

118. Plaintiff re-alleges and incorporates all preceding paragraphs with the same force and effect as if fully restated herein.

119. Defendant received benefits from Plaintiff and Class members and unjustly retained those benefits at their expense.

120. Defendant received benefits from Plaintiff and Class members in the form of the Plaintiff's highly valuable PII and PHI that Defendant wrongfully intercepted from Plaintiff and Class members and disclosed to third parties without authorization and proper compensation.

121. Defendant intentionally intercepted, stored, used, and disclosed this data for their own gain, providing Defendant with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

122. Defendant unjustly retained these benefits at the expense of Plaintiff and Class members all without providing any commensurate compensation to Plaintiff and Class members.

123. The benefits that Defendant derived from Plaintiff and Class members rightly

belong to Plaintiff and Class members.

124. Had Plaintiff and Class members known of Defendant's misconduct, they would not have provided any of their valuable data to Defendant or used Defendant's website.

125. It would be inequitable under unjust enrichment principles in every state for Defendant to be permitted to retain any of the profit or other benefits they wrongfully derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

126. Defendant should be compelled to disgorge profits into a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## VI. DEMAND FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the proposed Class respectfully requests that the Court enter an order:

A. Certifying the Class and appointing Plaintiff as the Class's representative;

B. Finding that Defendant's conduct was unlawful, as alleged herein;

C. Awarding declaratory relief against Defendant;

D. Awarding such injunctive and other equitable relief as the Court deems just and proper, including injunctive relief;

E. Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, restitution and/or disgorgement of profits unlawfully obtained;

F. Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

G. Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

H. Granting such other relief as the Court deems just and proper.

## VII. JURY TRIAL DEMANDED

127. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

DATED: September 29, 2025

Respectfully Submitted,

*/s/ Jason P. Sultzer*

Jason P. Sultzer, Esq.
Scott E. Silberfein, Esq.
**SULTZER & LIPARI, PLLC**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
silberfeins@thesultzerlawgroup.com

*Attorneys for Plaintiff and the Proposed Class*